## THE PEOPLE *vs.* JOHN J. HICKS.

The act of April 4, 1848, providing that in case of the absence of the presiding justice appointed to hold any general term of the supreme court, any three justices convened to hold such term may designate one of their number to preside at *such general term,* means that the person so appointed shall preside during *the whole of such term,* if deemed expedient; and not merely during such portion of the term as the absence of the regular presiding justice shall continue.

Thus, where, at the commencement of a term the presiding justice of the court is absent from the state, and another justice is, by an order duly made, designated by the three judges convened to hold the court, to preside at such term, he is authorized to preside during the whole of such term; notwithstanding the regular presiding justice returns to the district before the close of such term.

The district attorney is the proper person to procure a *certiorari* to be issued, to remove into the supreme court proceedings commenced by *habeas corpus;* and to act as attorney for the people, upon such certiorari.

The People *v.* Hicks.

To authorize a magistrate to take the first step towards the arrest of a person charged with the commission of a crime—viz. to examine the complainant on oath—a simple complaint that an offense has been committed, is all that is necessary.

All that need be proved, by the examination of the complainant, to authorize further action on the part of the magistrate, is that it shall furnish good grounds to believe that further investigation will lead to the discovery of crime.

Where the comptroller of the city of New-York appeared before the recorder, and upon his oath stated that from an examination of documents in his possession in his official capacity, and from information which he believed to be true, frauds, criminal in their nature and character, had been committed upon the public treasury of the city, to a large amount; specifying the particular character of one of the frauds, as a specimen of the nature and character of the others; *Held*, that this was a sufficient complaint, not only to authorize, but to require the recorder to investigate the matter thereof.

*Held also*, that upon such complaint the recorder had power to examine any witnesses who might be produced by the complainant, either voluntarily, or by means of such process as the law allows, to compel the attendance of witnesses. And that his authority was not limited to the examination of such witnesses as should voluntarily present themselves for examination.

The magistrate may issue subpœnas to compel the attendance of witnesses, in behalf of the complainant, on such an examination, which the witness is bound, and may be compelled, to obey.

And if it appears from the examination of the complainant, and witnesses produced by him, that a person is a material witness, and a subpœna is issued by the magistrate, to compel his attendance, and duly served upon him, but he refuses to attend; whereupon the magistrate issues an attachment, and the witness, on being brought before the magistrate, refuses to be sworn and testify, the magistrate has power to adjudge him to be guilty of a criminal contempt, and to commit him to prison therefor.

THIS was a certiorari issued for the purpose of removing to this court the proceedings had before a justice thereof, upon *habeas corpus.* Hicks was committed to prison, by the recorder of the city of New-York, for a criminal contempt, in refusing to be sworn and testify as a witness, upon a criminal complaint, before the recorder. Upon a writ of *habeas corpus* sued out by him he was directed to be discharged ; whereupon the proceedings were removed by certiorari.

EDWARDS, P. J.    The return to the *certiorari* shows that on the 21st of March, 1853, the comptroller of the city of New-

The People *v.* Hicks.

York appeared before the recorder, and upon his oath stated that in his official capacity he had the custody, care and control of documents, vouchers, and papers relating to the financial department of the city, and that from such documents, and from information received from various quarters, which information he believed to be true, frauds to a very large amount had been committed upon the public treasury of the city, which frauds he believed to be criminal in their nature and character. He further stated that there was one wherein the corporation of the city, as he believed, had been defrauded out of a sum of money which he specified, by the rendering of a false and fraudulent account; that the bill had been rendered for a greater amount than should have been charged to the corporation, and that the money was drawn out of the city treasury by virtue of a warrant founded upon such false and fraudulent account. And he also stated that he had reason to believe, and did believe, that various other frauds of a criminal character had been perpetrated upon the corporation in the presentation of bills. After this complaint was sworn to, the recorder issued a subpœna directed to the respondent, commanding him to appear before the recorder at a time and place therein stated, to testify the truth and give evidence according to his knowledge, in a certain matter on the complaint of the comptroller, and verified by the oath of himself and others, alleging and charging the commission of certain criminal offenses within the city of New-York. The respondent refused to appear as commanded by the subpœna, and thereupon the recorder issued an attachment, by virtue of which the respondent was brought before the recorder, and upon refusal to be sworn and testify, was adjudged to be guilty of a criminal contempt, and was committed to prison until he should submit to be sworn and testify, or until he should be discharged by due course of law.

The first objection taken upon the argument of the *certiorari* was, that the court, as then organized, could not entertain jurisdiction of the matter.

The facts upon which this objection was founded are, that at the commencement of the term of the court the justice elected in

this district who has the shortest time to serve, and who is designated by the statute as the presiding justice of the court, was absent from the state, and owing to such absence, the justice elected in this district who had the next shortest time to serve was, by an order duly made at the commencement of the term, designated by the three judges convened to hold the court to preside at such term. Some time afterwards, and during the continuance of the term, the regular presiding justice returned, and was in the city at the time when the *certiorari* was brought on for argument. Upon this state of facts it was contended that it was necessary to the legal organization of the court, that he should act as the presiding justice. The constitution declares that provision may be made by law for designating from time to time one or more of the justices of the supreme court, who is not a judge of the court of appeals, to preside at the general terms of the said court, to be held in the several districts. (*Const. art.* 6, § 6.) The judiciary act of 1847 provided that the justice of the supreme court in each judicial district having the shortest time to serve, and who was not a judge of the court of appeals, nor appointed or elected to fill a vacancy in the first class, should be a presiding justice in the supreme court. (*Laws of* 1847, *p.* 394.) And by an act passed in the year 1848 it was provided, that in case of the absence of the presiding justice appointed to hold any general term of the supreme court, any three justices convened to hold such term might designate one of their number to preside at *such general term.* (*Laws of* 1848, *p.* 282.) When the statute declares that the justice designated may preside at such general term, it clearly means at the *whole of such general term*, if deemed expedient, and not merely during such portion of such term as the absence of the regular presiding justice shall continue.

The next objection taken was that the district attorney had no authority to procure a *certiorari* to be issued.

The statute provides that all proceedings commenced under the article relating to writs of *habeas corpus* may be removed by *certiorari* into the supreme court, to be there examined and corrected. (2 *R. S.* 573, § 84.) It does not say who shall act

as attorney in the matter. In this case the people are the party in whose behalf the *certiorari* was issued, and the district attorney, who is the legal representative of the people in all proceedings relating to crimes in this district, is the proper person to act in the matter. (*See The People* v. *Cassels*, 5 *Hill*, 164.)

It was next contended that there was not such a judicial proceeding pending before the recorder as authorized him to act in the matter at all.

The statute provides that whenever complaint shall be made to any magistrate, having power to issue process for the apprehension of persons charged with any offense, that a criminal offense has been committed, it shall be the duty of such magistrate to examine on oath the complainant, and any witnesses who may be produced by him, and if it shall appear from such examination that any criminal offense has been committed, the magistrate shall issue a proper warrant, under his hand, with or without a seal, commanding the officer to whom it shall be directed forthwith to take the *person accused* of having committed such offense, and bring him before such magistrate to be dealt with according to law. After the person accused is arrested, the magistrate is bound to proceed as soon as may be to examine the complainant, and the witnesses on the part of the prosecution, and after the examination of the prisoner, his witnesses, if he have any, must be sworn and examined, and he may have the assistance of counsel in such examination ; and if it shall appear that an offense has been committed, and that there is *probable cause* to believe the prisoner to be guilty thereof, he shall be committed to prison, unless he shall be bailed. (2 *R. S.* 706, 707.)

It appears from this that there are two distinct stages in the proceedings which are necessary to authorize a final commitment. The one is preliminary to the issuing of a warrant ; the other is for the purpose of ascertaining whether the party charged with the offense shall be committed to prison. It will be observed that in both cases it must appear that an offense has been committed, but the statute requires that there shall be probable cause to believe the prisoner guilty only in the last case. The reason of this undoubtedly is, that it was intended to vest the

magistrate with a liberal discretion in issuing his warrant. It will also be remarked that the statute does not require that the complaint, to be made before the magistrate, shall be in writing, or under oath; and in this respect it differs from the complaint which is required in the case of proceedings to compel a party to enter into a recognizance to keep the peace. (2 R. S. 704.) The statute does not state in what form the complaint shall be made; nor what facts shall be set forth; nor whether it must' contain a charge against a particular person; nor whether the facts must be stated as within the knowledge of the complainant, or upon his information and belief. A simple complaint that an offense has been committed is all that is necessary to authorize the magistrate to act; that is, to examine the complainant on oath, which is the first step to be taken.

The question then arises, how much must be proved by the examination of the complainant to authorize further action on the part of the magistrate? It is clear that the statute does not contemplate that the complainant shall prove all that is necessary to authorize an arrest; for it declares that the magistrate shall also examine such other witnesses as shall be produced by the complainant. How much then must be proved by his examination? It seems to me that all that can be required is that enough shall appear to furnish good grounds to believe that further investigation will lead to the discovery of crime. The preliminary proceeding is instituted entirely for the purpose of investigation; and the whole object of the statute would be defeated if the deposition of the complainant should be required to state facts which would prove what it is the very end and purpose of the investigation to ascertain. If we examine the affidavit of the comptroller by this test, there can be no doubt that a sufficient complaint was presented to the recorder not only to authorize, but to require him, as a faithful magistrate, to investigate the subject matter of the complaint. The first officer in the financial department of the city government had made oath that from the examination of documents in his possession, in his official capacity, and from information which he believed to be true, frauds criminal in their nature and character had

The People *v.* Hicks.

been committed upon the public treasury of the city. He had also stated the particular character of one of the frauds charged, as a specimen of the nature and character of the others; and although his description of the offense might not be sufficient in an indictment for procuring money by false pretenses, yet it contains so many of the elements of crime that no magistrate could, consistently with a proper discharge of his duty, refuse to give the matter any further investigation.

But it is said that even if this be so, still that the recorder had no power to examine any other witnesses than such as were produced before him by the complainant; that is, such as voluntarily presented themselves for examination.

The English statute of 1 and 2 Ph. and Mary, ch. 13, § 4, provided that the justices, or any one of them, being of the quorum, when any prisoner was brought before them for manslaughter or felony, should take the examination of the prisoner and information of *them that brought him*, of the fact and circumstances thereof. And Chitty says that " the magistrate having by this statute, authority to examine the party bringing the offender, which expression is construed to include as well the accuser as all witnesses in support of the charge, as incident to his authority, has a power to bring before him all persons who appear upon the oath of the informer, or who may occur to the magistrate himself, to be material witnesses for the prosecution, and for this purpose may issue his warrant to a constable, requiring him to cause the witness to appear before the magistrate, and give evidence." (1 *Chit. Cr. L.* 76.)

But what would be the practical effect of adopting the construction contended for by the respondent? A complaint might be made, and witnesses might be produced in support of it, and there might be sufficient evidence to show that an offense had been committed, if a single additional fact could be proved, and the examination might establish beyond a doubt that a particular person could prove that fact, but such person would not appear before the magistrate voluntarily. The result would be that the whole prosecution would fail for want of power to compel the attendance of the witness. Or a case might occur in which one

of the witnesses who voluntarily appeared in support of the complaint knew of the fact which might be essential to make the chain of evidence complete; and he might refuse to be examined, and withdraw, and the magistrate could not prevent him from doing so. But it is said that this only shows that the law is defective. I do not think so. I think that it shows rather that such a construction of the law as is contended for is neither reasonable nor sound. When the statute says that the magistrate shall examine any witnesses who may be produced by the complainant, it means any witnesses who may be produced, either voluntarily or by means of such process as the law allows to compel the attendance of witnesses. Every party to a suit produces the witnesses on his behalf, at the trial. But in doing so he is not confined to such witnesses as voluntarily appear. If necessary he resorts to compulsion. It does not follow because no express power is given to the magistrate to issue a subpœna, that no such power exists. In an anonymous case, which is reported by Lord Coke, (12 *Co. Rep.* 130,) he says that on a motion made by him before the justices of the king's bench, it was unanimously resolved " that when the statute gave power to justices of the peace to require any person or persons to take the oath, the law impliedly gave them power to make a warrant to have the body before them; for *quando lex aliquid alieni concedit, conceditur et id sine que res ipsa esse non potest.*"

In reference to the question before us the statute states what are the general duties of the magistrate. It does not profess to point out the means by which he is to execute those duties. And it seems to me that the natural and necessary conclusion is that he may use such means as are known to the law, and such as are used in all similar cases, (*see The People* v. *Wyngall,* 5 *Hill,* 19,) and such must have been the intention of the legislature ; for the statute which provides for the fees of justices of the peace in criminal cases, allows a charge "for a subpoena for each witness;" and in a subsequent section it provides, that "whenever any magistrate shall issue any subpœna in any criminal proceeding or trial, he shall indorse upon the back thereof a memorandum, showing whether the same

was issued for the people or the prisoner." (2 *R. S.* 749.) These provisions show beyond a question, that it was supposed by the legislature that the magistrate had the power to issue a subpœna in criminal proceedings; or, in other words, the power is assumed to exist. But it is said that even if the power to issue a subpœna exists, still that the magistrate has no right to enforce the attendance of the witness in case of disobedience. The power to issue a subpœna means the power to issue one which shall be effective, or it means nothing. It means the legal and not the mere physical power. It means the power to issue a subpœna which the party is bound, and may be compelled to obey. But it is said that even if this power exists, yet that the magistrate cannot compel the witness to be sworn.

The statute which makes provision respecting criminal proceedings, gives express power to any magistrate to punish for contempt in the like cases, and in the like manner, as is provided in the second chapter of the third part of the revised statutes, in relation to justices of the peace in civil cases. (2 *R. S.* 748.) In the chapter referred to, it is provided that when a witness attending before any justice, shall refuse to be sworn, and the party at whose instance he attended shall make oath that the testimony of such witness is so far material, that without it he cannot safely proceed in the trial of such cause, such justice may by warrant commit such witness to the jail of the county. (2 *R. S.* 274.) In the case of criminal proceedings there is no cause pending, and no party to a cause to make an affidavit of the materiality of the witness. It was in reference to this difference in the two cases, that the statute provided that the magistrate might punish in the *like cases*, and in the *like manner*, and not in the same cases and in the same manner. The object of the statute which requires the oath of the party is, that the justice may have sufficient evidence of the materiality of the witness. In the case before us, the recorder certifies that he had examined the complainant, and certain witnesses produced by him, touching the matters embraced in the complaint, and that upon such examination it satisfactorily appeared to him that the respondent was a material witness. As the letter

of the statute cannot be followed, it seems to me that it is a suf-
ficient compliance with its spirit, that enough appear from the
examination taken before the magistrate to show the materiality
of the witness. There could be no more satisfactory manner of
ascertaining his materiality, and the judgment of a magistrate
is certainly of as much weight as the opinion of a party, although
given upon oath.

I think that the order discharging the respondent should be
reversed, and that he should be remanded to the custody of the
sheriff, to be held by him under the commitment issued by the
recorder.

Roosevelt, J. The witness Hicks was committed by the re-
corder, and discharged by a judge of this court. We are now in
effect, under the certiorari which has been issued, called upon
to decide which of these two officers was right. If, on the re-
turn of a habeas corpus, sued out by a party alleging himself to
be unjustly deprived of his liberty, it shall appear upon exam-
ination by the officer, that the prisoner is detained in custody
"for any contempt specially and plainly charged in the commit-
ment, by some court, officer or body *having authority to com-
mit for the contempt so charged*," the law makes it his duty
"*forthwith to remand such party*." (2 *R. S.* 567.) From
this language, as well as from the nature of the case, it is obvi-
ous that the legislature, in allowing a habeas corpus, did not
intend that the officer issuing it should revise the decision of
the committing magistrate, and determine whether the party
charged had, or had not, been actually guilty of the contempt
alleged. He was simply to determine two questions : *first*,
whether on the face of the commitment, a contempt was spe-
cially and plainly *charged ;* and *secondly*, whether the officer,
whose name it bore, had *authority* to commit in such cases. To
remove all doubt, however, the legislature in another section of
the same act, (§ 42,) expressly declared that "no court or officer,
on the return of a habeas corpus, should have power to inquire
into *the justice or propriety* of any commitment for a contempt,
made by any court, officer or body, according to law," provided

The People *v.* Hicks.

the contempt was specially and plainly " charged in the commit-
ment," as above directed. (*See also The People* v. *Cassels,*
5 *Hill,* 164.)

Is the recorder, then, an officer having authority to commit
for contempts, such as that charged in the commitment now un-
der review ? The statute, in relation to the arrest and exam-
ination of offenders, (2 *R. S.* 706,) declares that justices of the
supreme court, *recorders of cities,* and sundry other officers de-
signated in it, " shall have power to issue process for the appre-
hension of persons charged with any offense, and to execute the
powers and duties conferred in that title." And it further pro-
vides . (§ 23) that " whenever complaint shall be made to any
such magistrate that a criminal offense has been committed, it
shall be the duty of such magistrate to examine on oath the
complainant, and any witnesses who may be produced by him.
And if it shall appear, from such examination, that any criminal
offense has been committed, the magistrate shall issue a proper
warrant, &c., to take the person accused, &c., and to bring him
before such magistrate to be dealt with according to law."

Thus, it will be seen, it is not only the right, but the duty of
the recorder, to investigate criminal accusations. But how is he
to investigate if he has no power to compel the attendance of
witnesses ? It is said he may interrogate on oath the person
preferring the complaint, and the witnesses who may voluntarily
submit themselves to his examination. If, however, the wit-
nesses, shown perhaps to have been actually present at the com-
mission of the offense, refuse to volunteer, must the course of
criminal justice for that reason stand still ? Has the magistrate,
although charged with a duty, no compulsory power to enable
him to perform it ? If a suit, even between private individuals,
be pending in another state, a justice of the peace in this state
may compel the attendance of a witness to testify in behalf of
either party. (2 *R. S.* 398.) And yet if a criminal proceeding
before a like magistrate be pending in this state, for an offense
against the state itself, no such power it is said exists in behalf
of the people. To such a length indeed is the proposition car-
ried, that if the magistrate himself, from a window of the city

hall, saw three persons together in the street, one of whom he knew and the others not, and a murder were actually perpetrated under his own eye, he could not compel the known person to attend and testify as to the name of the murderer, so as to enable him to issue a warrant for his apprehension. Such a state of the law, if it existed, would argue great remissness on the part of the legislature, and indeed would involve them in the absurdity of giving to the magistrate the power of issuing process for the apprehension of persons accused, and yet denying him the power of issuing a summons to require the attendance of a witness to enable him to determine whether the process of arrest ought to be issued; and the further absurdity of providing, under the title of "fees of justices of the peace," an allowance for a subpœna for each witness, of six cents," (2 *R. S.* 749,) without any authority to issue a subpœna; and finally the still further contradiction of expressly enjoining that "whenever any magistrate shall issue any subpœna in any criminal proceeding or trial, he shall indorse upon the back thereof a memorandum, showing whether the same was issued for the people or for the prisoner."

It would seem from these provisions, to be perfectly obvious that the legislature, when they gave to the magistrate the power of examining into offenses and arresting offenders, supposed that, by necessary implication, they had also given him the authority necessary "to execute the powers and duties conferred," comprehending in the grant the power "to issue a subpœna for the people in any criminal proceeding." It is also a fundamental rule, in the construction of statutes as well as constitutions, that the grant of an express power carries with it, by necessary implication, every other power necessary and proper to the execution of the power expressly granted.

Assuming then that the magistrate had authority to compel the attendance of the witness and to require him to be sworn and testify, had he authority to punish a refusal on the part of the witness to give evidence when actually in the presence of the magistrate; and, if so, in what manner?

Under the head of "miscellaneous provisions respecting crim-

The People *v.* Hicks.

inal proceedings," it is enacted (2 *R. S.* 748, § 44,) that "any magistrate authorized to exercise any jurisdiction in respect to offenses, shall have the same power to preserve order, during any judicial proceedings, and to punish for contempts in the like cases and in the like manner, as provided in the second chapter of the third part of the revised statutes in relation to justices of the peace in civil cases." By those provisions, (2 *R. S.* 240, § 83,) a justice of the peace is authorized to issue subpœnas "to compel the attendance of witnesses to give evidence, on any trial depending before himself or any other justice." And on their refusal or neglect to attend, in conformity to such subpœna, and on "competent testimony to the satisfaction of the justice, that the testimony of such witness is material," it is provided that "the justice shall have power to issue an attachment to compel the attendance of such witness;" and if (*page* 274, § 279,) he shall "refuse to be sworn in the form prescribed by law, or to answer any pertinent or proper question, and the party at whose instance he attended shall make oath (afterwards altered in 1834, to "other competent evidence,") that the testimony of such witness is so far material, &c. such justice may by warrant commit such witness to the jail of the county, &c. until "he submit to be sworn or to answer."

No doubt then, it seems to me, can remain that the recorder, if he was, as he certifies he was, satisfied of the materiality of the testimony of the witness Hicks, and if a judicial proceeding was lawfully pending before him—in other words if complaint had been made to him that a criminal offense had been perpetrated—was authorized to investigate the charge, and with that view, to compel the witness, on pain of imprisonment, to disclose his knowledge on the subject.

Was then a complaint, such as is contemplated by the statute, duly made to the recorder? No particular form, it is conceded, was necessary; not even the use of writing. A mere parol statement, such as any citizen, without professional aid, might make, provided the act charged was a criminal offense, was all the law required. Such we believe is the universal understand-

ing and the every day practice. What then was the complaint in this case? The recorder certifies that the comptroller of the city "appeared before him and made complaint that certain criminal offenses, to wit, criminal frauds upon the corporation of the city of New-York, and the obtaining by criminal means money from the treasury of said city, had been committed, in the city of New-York, by divers persons unknown." That the comptroller (admitting the certificate in that respect to be open to review) did substantially make the complaint so certified is proved by his affidavit; and the only point, therefore, suggested by the return, and remaining to be considered, is, do the acts complained of, if proved, constitute in law " a criminal offense?"

By the 32d section of the general provisions concerning crimes and their punishment, (2 *R. S.* 702,) it is declared that " the terms 'crime,' or 'offense,' when used in this chapter or in any other statute, shall be construed to mean any offense for which any criminal punishment may by law be inflicted." Frauds, affecting the public, may, in certain cases, be punished criminally, even at common law. (*The People* v. *Stone,* 9 *Wend.* 182.) And under the statute, (2 *R. S.* 677,) every person who, with intent to cheat or defraud another, (extended by a subsequent section at page 703 to cities and corporations generally) shall designedly by color of any false token or writing, or by any other false pretense, obtain the signature of any person to any written instrument, or obtain from any person any money, personal property, or valuable thing, upon conviction thereof shall be punished by imprisonment, &c. There is then a class of frauds, which are not only criminal in their nature, but criminal in law, and punishable by the courts as "criminal offenses," and a class, therefore, of which the recorder, and the other magistrates referred to, had jurisdiction so far at least as to inquire into their probable commission, and their probable perpetrator, and to order his arrest and trial.

Again, it is objected, that the comptroller, in his complaint, accuses no particular persons by name. The law, to set the proceeding in motion, requires no such specification. It simply

The People *v.* Hicks.

provides that complaint shall be made that a criminal offense has been committed; no matter by whom. One of the very objects of the preliminary inquiry may be, and we know frequently is, to *ascertain* the name of the perpetrator as well as the other particulars of the alleged offense. To this end witnesses are to be produced by, that is on the part of, the complainant. They are to be produced, as witnesses are usually produced by plaintiffs and defendants in civil suits—by request, if willing, by subpœna, if not—it being the universal understanding that a witness attending by either mode, at the instance of a party, is a witness " produced by" the party. It is their testimony, which is not only to corroborate, but to give certainty to the accusation, and to determine at whose door it should be laid. All the complainant can make oath to may be that the act has been done, and that A. B. and C. D., if interrogated, can tell who did it. For aught that appears, this, in the present case, was precisely the position of Mr. Hicks, and the only question intended to be put to him was, do you know the handwriting of a certain fraudulent voucher? Can it be possible that the witness, in such a case, can fold his arms, and in effect say to the magistrate, "first tell *me* who did it, and then I will tell *you* ?" Allow such an objection, on the part of a witness to prevail, and a murderer, perpetrating his bloody deed in broad day, in the presence of a dozen bystanders, might, as already suggested, walk the streets untouched, if eleven of those bystanders preferring the complaint were ignorant of his name, and the twelfth who knew it, refused, unless coerced, to make the disclosure.

Much has been said of the supposed inquisitorial character of the proposed examination ; and the recorder, in the rhetorical language of counsel, has been painted as boring or attempting to bore a sort of judicial auger into the bosom of the witness, to extract from that sacred repository the secret thoughts and purposes, which its owner, as an American freeman, had a right to vail from the eyes of all but the Omniscient. The history of the long since buried and justly execrated court of star chamber has also been cited by way of warning. Were this court to yield to such appeals, every party and every witness, in civil

as well as in criminal proceedings, might with as good and in most instances much better grounds, claim exemption equally with Mr. Hicks. The privilege of withholding information, in the possession of a witness, not implicating himself, and of which the public good demands the disclosure, can challenge no sympathy, and, it seems to me, is entitled to no favor. There may be considerations, it can well be conceived, which should induce a witness, or at least justify him, not to volunteer; but when a magistrate, indisputably possessing criminal jurisdiction, after objection and argument, decides that a witness is bound to answer, a persistence in refusal, unless satisfactorily explained, savors more of obstinacy than the assertion of right.

Having arrived at the conclusion that the recorder had the lawful authority to require the witness to testify, and to enforce his decision, if necessary, by imprisonment, nothing is left for us but to remand the witness to the custody of the sheriff, there to remain until he shall submit to be sworn and to testify. As a consequence, the order appealed from, discharging the said John J. Hicks, should be reversed.

EDMONDS, J. concurred.

                             Order reversed.

[NEW-YORK GENERAL TERM, May 2, 1853. *Edwards, Edmonds* and *Roosevelt,* Justices.]